FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 14 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

KENNETH MORRISON
          Plaintiff,

   -against-

TARIK DAVIS,

          Defendant.

------------------------------------------------------------ X

NO. 10-CV-5170 (ARR) (LB)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

*Pro se* plaintiff, Kenneth Morrison, brings this diversity action against defendant, Tarik Davis, seeking damages related to defendant's alleged legal malpractice when acting as plaintiff's counsel from August through November 2007. Now before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

The following facts are derived from plaintiff's deposition and the parties' respective Local Rule 56.1 statements. Facts are undisputed except where otherwise noted.

Tarik Davis, a licensed attorney in the state of New York, first met plaintiff, Kenneth Morrison, and his older sister, Acynthia Bowman, in his office in March 2006. Acynthia Bowman, then 77 years-old, in poor health and accompanied by plaintiff, retained DAvis to assist in the execution of a "no-consideration" transfer to plaintiff of her condominium located at 100 Sterling Place, Apt. 1A, Brooklyn, New York, and to prepare her Last Will and Testament. During this representation, Ms. Bowman several times related to defendant that she feared her adult daughter, Carol Bowman-Sanchez, and that she wished her brother to become her legal

1

guardian.

Over the course of the following year, Davis learned through somewhat regular communication with plaintiff that Carol Bowman-Sanchez had not only been cruel to her mother, Acynthia, but had coerced her mother into granting her power of attorney. On May 30, 2006, plaintiff, out of the country at the time, sent defendant a facsimile detailing his sister's difficulties and requesting Davis's assistance in being appointed her legal guardian. On August 27, 2007, plaintiff retained Davis to represent him in an application to be named legal guardian for Acynthia— a course of action, which, under the circumstances, Davis believed most appropriate to protect Acynthia's interests. According to defendant, he accepted the representation with some hesitation, as he was concerned about the potential for a conflict of interest: In the event Acynthia opposed plaintiff's guardianship application, Davis's prior representation of Acynthia in March 2006 could compel him to withdraw. Given Acynthia's consistent indications that she feared her daughter Carol and wanted her brother to be appointed guardian, however, defendant believed the potential for a conflict to be minimal. The parties dispute whether plaintiff was ever made aware of the potential for conflict. On September 11, 2007, plaintiff executed a petition—prepared by defendant—in support of an order to show cause why Morrison should not be named the guardian of Acynthia pursuant to Article 81 of the New York Mental Hygiene Law. The petition was accompanied by plaintiff's sworn affidavit stating that Acynthia Bowman was ill, unable to care for herself, and unable to manage her own finances.

On November 9, 2007, defendant appeared on behalf of plaintiff at the Article 81 hearing before Justice Betsy Barros in the Supreme Court of New York, Kings County. After discussions that morning with the Justice Barros, the court evaluator, and Acynthia's court-

appointed attorney,[1] it became clear that Acynthia preferred that her daughter Carol act as her legal guardian and did not, as Davis had anticipated, consent to her brother's guardianship. Having previously represented Acynthia Bowman in her no-consideration transfer of the Condo to plaintiff and now adverse to her in the guardianship proceeding, defendant confronted a clear conflict of interest. Accordingly, defendant either voluntarily withdrew his representation or was removed from the case by Justice Barros.[2] What transpired next is a matter of dispute and at the heart of plaintiff's alleged injuries.

Notwithstanding the conflict of interest, defendant Davis remained active in the proceedings before Justice Barros throughout the day. From the portion of the hearing submitted to the court, it appears that Davis operated, if not explicitly as plaintiff's representative, as a conduit between Justice Barros and Morrison. At some point early in the proceedings, Sonali Lesli-Hopkins, court-appointed counsel for Acynthia Bowman, expressed to defendant her intent to vacate the March 2006 no-consideration transfer of Acynthia's condominium on the ground that Acynthia Bowman lacked capacity at the time of the transfer. It is undisputed that Davis related this information to plaintiff, and informed him that Acynthia's attorney would challenge the transfer if Morrison did not voluntarily re-convey the property to his infirm sister. It is also undisputed that, after this discussion, Davis represented to Justice Barros that Morrison had agreed to voluntarily re-convey the condominium to his sister in exchange for reimbursement of the property tax payments he had made since taking over the condominium in March 2006.

---

[1] A court evaluator in Article 81 proceedings is appointed by the court to explain the proceeding to the alleged incapacitated person, investigate claims made in the application for guardianship, and help the court determine whether the alleged incapacitated person wishes to retain legal counsel or whether the court ought to appoint legal counsel. N.Y. Mental Hygiene Law §§ 81.09—81.10.

[2] Whether defendant voluntarily withdrew as counsel after being confronted with the conflict, or was "furiously" compelled to abandon his representation by Justice Barros is a matter of dispute between the parties. It is not, however, relevant to the instant motion.

Accordingly, plaintiff, defendant, and Lesli-Hopkins signed two stipulations stating (1) "that this agreement is reflective of [plaintiff's] intent regardless of the demise of Acynthia Bowman and to relinquish any and all interest he may have in the property" and (2) that plaintiff would be reimbursed to the sum of $2,307.62. Justice Barros "so ordered" the stipulations. It is the nature of the discussion between Davis and Morrison leading up to Morrison's "voluntary" re-conveyance of the condominium that forms the basis of the instant dispute.

According to defendant, he simply informed plaintiff of the fact—without offering any advice—that Lesli-Hopkins, on behalf of Acynthia, planned to challenge the transfer if Morrison did not voluntarily re-convey the condominium. In response, plaintiff expressed his lack of interest in expending any resources fighting over the property and wished to voluntarily re-convey the property as long as he was reimbursed for paid property taxes. Davis maintains that he then relayed this information, without advocating, to Justice Barros, who assisted the parties in reducing the agreement to the above stipulations.

Morrison's account differs markedly. According to Morrison, over the course of three hours, Davis threatened and pressured him into agreeing to return ownership of the condominium to his sister. Morrison claims that Davis told him that "[Justice] Barros was very angry with [Davis] and threatened [Davis] with sanctions unless he got [Morrison] to sign the document returning the property to Ms. Acynthia Bauman [sic]." Morrison also understood from this discussion that if he did not sign the stipulations, both he and Davis would be in "serious trouble." Although Morrison admits that Davis made no actual reference to law enforcement, Morrison interpreted "serious trouble" to mean that the police would somehow be involved. Accordingly, Morrison alleges, he re-conveyed his rights to the Condo under duress as a result of Davis's threats and/or inadequate legal representation even after Davis's conflict of interest had

come to light. At the end of the proceedings, Justice Barros found Ms. Bowman to be incapacitated and appointed her daughter Carol legal guardian.

Plaintiff filed a complaint to the State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial District. On November 16, 2009, the Committee notified plaintiff that Davis had been issued a "Letter of Caution" as a result of his conduct.[3]

Plaintiff now files the instant action seeking damages caused by plaintiff's alleged legal malpractice.[4] Plaintiff seeks $1.3 million in damages alleged to be the fair market value of the condominium at 100 Sterling Place, Apartment 1A, which, he claims, he would not have reconveyed to his sister but for defendant's pressure and poor legal representation. He also seeks $350,000 in consequential damages for debt he allegedly incurred as a result of foreclosure proceedings currently pending against his home in Florida. Plaintiff claims that, but for defendant's legal malpractice, he would have avoided foreclosure with the proceeds of an anticipated sale of his sister's condominium.

## II. DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine

---

[3] While the court does not have the benefit of the confidential letter the Grievance Committee issued to defendant, issuance of the letter does not mean that the Committee necessarily found defendant's actions to constitute misconduct. "A Letter of Caution is sent when the committee is of the opinion that the attorney acted in a manner which, while not constituting clear professional misconduct, involved behavior requiring comment." See http://www.nycourts.gov/courts/ad2/attorneymatters_ComplaintAboutaLawyer.shtml.

[4] Mr. Morrison devotes much of his papers to disputing that his lawsuit is not a "legal malpractice" case, but a case alleging defendant's "gross negligence." Because plaintiff alleges that defendant failed to exercise the appropriate level of care in his capacity as plaintiff's attorney, the applicable tort is legal malpractice. The law imposes a higher standard of care on an attorney acting on behalf of a client. Therefore, characterizing Morrison's pro se complaint as alleging legal malpractice actually inures to plaintiff's benefit.

5

whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003) (internal quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment against it, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

B. Legal Malpractice

Under New York law, an action for legal malpractice requires a showing that (1) the attorney's conduct was negligent, and (2) the negligence was the proximate cause of plaintiff's

6

"actual damages." Russo v. Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, 301 A.D.2d 63, 67 (1st Dep't 2002). Though there is a disputed issue of fact as to whether defendant's conduct over the course of his representation of plaintiff was negligent, plaintiff has put forth no evidence that, as result of defendant's alleged malpractice, plaintiff suffered actual injuries.

1. *Davis's Negligence*

In order to sustain a claim of legal malpractice, "a plaintiff must establish . . . that the defendant attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession . . . ." Ambase Corp. v. Davis Polk & Wardwell, 8 N.Y.3d 428, 434 (2007). While the record is incomplete, there is a disputed issue of fact as to whether Davis continued to represent plaintiff even after his conflict of interest became apparent. At the very least, by agreeing to represent Morrison in the guardianship proceeding, Davis entered into a legal representation that he reasonably should have known was likely to result in a conflict of interest. Indeed, drawing all factual inferences in favor of plaintiff, as the court must at this stage, Davis continued to represent, advise, and even pressure plaintiff after the conflict of interest was actually realized.[5] Because defendant sat on both sides of the disputed transaction involving Ms. Bowman's property, a reasonable juror could conclude that such continued representation and alleged pressuring constituted an ethical violation falling short of the standard of reasonable conduct expected of a member of the legal profession. Drawing all inferences in

---

[5] Davis argues that Justice Barros's removal of him from the case severed any attorney-client relationship between himself and Morrison, thereby precluding any liability for legal malpractice on his part. At this state of the proceedings, however, it is unclear whether plaintiff is alleging not merely Davis's malpractice in agreeing to represent plaintiff at the hearing, but also his malpractice in continuing to act as plaintiff's counsel even after the existence of a conflict of interest became apparent. Without the benefit of a more fully developed record, there remains a disputed issue of fact as to whether Davis continued to hold himself out as plaintiff's counsel even after his "removal" or withdrawal from the case. Indeed, defendant's signature on the stipulations by which Morrison agreed to relinquish any claim to the condominium in return for reimbursement of the property taxes he had paid—albeit at the insistence of Justice Barros—is some evidence that Davis continued to act as plaintiff's counsel.

favor of plaintiff, it cannot be concluded as a matter of law that Davis's conduct was not negligent.

2. *Causation*

Even if defendant's conduct over the course of his representation may be found to have fallen below the standard of care reasonably expected of the legal profession, the inquiry is not at an end. To make out a claim of legal malpractice, plaintiff must also show that he "would have prevailed in the underlying action or would not have incurred any damages but for the attorney's negligence." Schruz v. Bodian, 939 N.Y.S.2d 81, 82 (2d Dep't 2012) (quoting Marino v. Mipsitz, Green, Fahringer, Roll, Sailbury & Cambria, LLP, 928 N.Y.S.2d 462, 462 (2d Dep't 2011)); see also Ambase Corp., 8 N.Y.3d at 434; Agate v. Herrick, Feinstein LLP, 870 N.Y.S.2d 250 (1st Dep't 2008). To satisfy this second element of malpractice, plaintiff must establish that Davis's conflict of interest or asserted pressuring of plaintiff to relinquish his right to the condominium caused plaintiff to incur damages. More specifically, in the circumstances of this case, plaintiff must show that had he not relinquished any right to the condominium by stipulation, he would have prevailed in his sister Acynthia's anticipated lawsuit against him to recover the condominium because in that anticipated lawsuit, he would have been able to show that Acynthia had the physical and mental capacity to enter into the March 2006 no-consideration transfer of the condominium to him. Defendant Davis argues that there is no evidence in the record that, but for defendant's alleged misconduct, plaintiff would not have suffered any "actual and ascertainable damages." Hashmi v. Messiha, 886 N.Y.S.2d 714 (2d Dep't 2009). Given the Article 81 court's finding in November 2007 that Acynthia was incapacitated, I agree.

8

New York courts have consistently vacated no-consideration or small-consideration transfers of property where the transferor was later found incapacitated. Jenkins v. Stephenson, 745 N.Y.S.2d 30 (2d Dep't 2002) (finding after evidentiary hearing no-consideration transfer was void where individual had been found to be incapacitated at a later date); In re Johanna C., 824 N.Y.S.2d 142 (2d Dep't 2006) (voiding property transfer by person found incapacitated). Under New York law, the burden of voiding a transfer of real property on the ground of undue influence, fraud or coercion generally rests on the party challenging the transfer. Where a confidential or family relationship exists, however, the burden shifts to the beneficiary of the transaction to prove the transaction fair and free from undue influence. See Sepulveda v. Aviles, 762 N.Y.S.2d 358, 363 (1st Dep't 2003); In re Mazak, 732 N.Y.S2d 707, 709 (3d Dep't 2001) ("In such situations, if one party deals with another from a position of . . . weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. . . ."); Wiencko v. Marincin,8 190 N.Y.S.2d 101, 102 (1st Dep't 1959) (applying doctrine to sibling relationship). Therefore, in the underlying challenge to the "no consideration" transfer, Morrison would have borne the burden of establishing that Acytnthia's conveyance of her condominium to him was not the result of undue influence or coercion.

On this record, however, there is no reason even to address whether plaintiff would have successfully defended his claim to the property. Under New York Law, plaintiff must come forward with some facts in the record, beyond his mere speculation, to establish that he would have prevailed in the lawsuit to void the conveyance based on Acynthia's incompetence. See

9

Schruz, 939 N.Y.S.2d at 82. Because there is no evidence in the record supporting the merits of plaintiff's underlying claim that if challenged, he could have retained the condominium, andn because the only evidence in the record, especially the judicial finding of Acynthia's incapacitation in 2007, supports the opposite conclusion, there are no material issues of fact suggesting that defendant's misconduct proximately caused any injury to plaintiff.

More specifically, the petition for guardianship, sworn to by plaintiff on September 11, 2007, attests that Acynthia Bowman was "unable to take care of any of her personal needs. She is unable [to] bath[e], feed or dress herself. She is totally home bound and unable to manage any of her financial affairs." Nothing in the record suggests that Acynthia Bowman was in any better condition on March 20, 2006, when she executed the no-consideration transfer, than she was on November 9, 2007, when the Article 81 court declared her incapacitated and appointed her daughter Carol legal guardian. In fact, as early as May 30, 2006, plaintiff communicated to defendant his fears about the treatment of his sister, and, significantly, that "it has recently been suggested that I take over guardianship of my sister, Mrs. Bowman, which she no doubt would welcome. In view of my present situation I do not know how this would or could work, and would like you[r] opinion on this matter." See Fax Dated Mar 30, 2006, annexed as Exhibit B to Plaintiff's Affidavit in Opposition to Defendant's Motion ("Morrison Aff."). Plaintiff further described his sister as a frail 77 year-old woman, who was five feet, nine inches tall and weighed a mere 60 pounds. The record is thus undisputed that less than two months after the transfer of the property, plaintiff believed that his sister required a legal guardian because she was weak and incapable of caring for herself or managing her own affairs. Given Acynthia's uncontested deteriorated condition in May 2006, a court considering a challenge to the no-consideration transfer of her condominium to plaintiff, her brother, two months earlier, necessarily would have

concluded that she was, if not wholly incapacitated, at least in a considerable position of weakness vis-à-vis her brother. Moreover, plaintiff was not merely the beneficiary of his sister's impromptu gift of her apartment. Rather, plaintiff accompanied Acynthia in seeking out Davis as an attorney to represent her, and subsequently became Davis's primary contact in matters concerning Acynthia. It is also evident from the record before the court that plaintiff was significantly involved in engineering and overseeing the no-consideration transfer, casting additional doubt on whether his sister's gratuitous transfer was free from his undue influence. In light of Acynthia's condition and plaintiff's significant involvement in the transfer, the record establishes that plaintiff could not have met the burden of proving that the disputed transaction was fair and free from undue influence. See Sepulveda, 762 N.Y.S.2d at 363; Mazak, 732 N.Y.S. 2d at 709.

Put simply, plaintiff has adduced no evidence that he would have succeeded in the underlying action to retain his rights to his sister's condominium. Ambase Corp. 8 N.Y.3d at 346 (rejecting malpractice claim where court had "no way to know" whether different legal advice would have altered the outcome). Rather, apart from plaintiff's unsupported speculation, the sparse evidence in the record points to only one conclusion—that is, that plaintiff's title to the Brooklyn condominium was inevitably doomed.

To be sure, defendant admits that he should not have represented plaintiff in the guardianship proceeding in view of the likelihood that a conflict of interest would arise. And, while the record is less clear on this point, defendant's continued role, as counsel or otherwise, in the Article 81 proceeding on November 9, 2007, despite the realization of that conflict raises additional concerns about defendant's conduct. Notwithstanding defendant's missteps, however, plaintiff offers no evidence that, but for defendant's misconduct, he would have been able to

retain the condominium. Accordingly, I find that any legal misconduct committed by defendant did not proximately cause any actual or ascertainable damages to plaintiff. Defendant's motion for summary judgment is therefore granted.

## CONCLUSION

Because there is no evidence in the record that defendant's alleged misconduct proximately caused any actual injury to plaintiff, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/
_____
Allyne R. Ross
United States District Judge

Dated: June 14, 2012
Brooklyn, New York

SERVICE LIST:

**Plaintiff:**

Kenneth Morrison
1426 Barn Owl Loop
Sanford, Fl 32773